UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

HOWARD SWEAT, as Administrator of the )
Estate of Anthony Tyrone Moore, )
) No. 5:18-CV-557-REW
Plaintiff, )
)
v. )
) OPINION AND ORDER
RICHARD W. SANDERS, et al., )
)
Defendants. )

\*\*\* \*\*\* \*\*\* \*\*\*

The supervisory Defendants in this action—Kentucky State Police (KSP) Commissioner Richard W. Sanders, former KSP Deputy Commissioner William Alexander Payne, and KSP Captain Michael T. Kidd—jointly move to dismiss all claims against them. DE #9. Defendants argue that dismissal is proper based on immunity and Plaintiff's failure to state cognizable claims under the applicable law. For the reasons that follow, the Court grants the Motion, on the terms of this Order.

I.  **Facts and Procedural Background**

The facts of this case are straightforward, tragic, and not at this juncture seriously in dispute[1]—the controversy lies in where the blame falls. On August 29, 2017, just before 2:30 a.m., Plaintiff's decedent, Anthony Tyrone Moore, was walking along Old Georgetown Road in Lexington, Kentucky, heading to work. DE #16 (Amended Complaint) at ¶¶ 2, 10.[2] Unknown and

---

[1] Indeed, the Court accepts any well-pleaded facts as true, per Rule 12. *See Nwanguma v. Trump*, 903 F.3d 604, 607 (6th Cir. 2018) (citing *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008)).

[2] As discussed later in this section, the pending Motion to Dismiss (DE #9) preceded the Amended Complaint (DE #16). However, the Amended Complaint did not alter the action's factual basis, nor did it impact the claims against the supervisory Defendants. *Compare* DE #1 *with* DE #16.

unrelated to Moore, a parallel set of events was unfolding nearby; the two scenes would soon catastrophically converge. Nathaniel Harper had just stolen a Dodge pickup truck from a Lawrenceburg, Kentucky couple's driveway, and local officers attempted to stop the vehicle; Harper fled in the boosted truck, and state police stepped in to assist. The KSP located Harper on I-64, headed east. *Id.* at ¶¶ 10–11. KSP troopers deployed a tire deflation device as Harper drove along I-64, but Harper persisted. *Id.* The troopers continued to pursue Harper as he exited the interstate, travelling toward Lexington on Newtown Pike with deflated front tires. *Id.* While driving at a speed between 80 and 100-mph—in a 35-mph residential area—Harper lost control of the vehicle on a right-hand turn and "struck a pedestrian, fence, utility pole, and the residence of 227 Old Georgetown Road" before the truck "overturned and caught fire." *Id.* at ¶ 10. That pedestrian was Moore, who died as a result of the collision. *Id.* at ¶ 11.

Plaintiff—administrator of Moore's estate ("the Estate")—avers that this high-speed pursuit occurred in contravention of express KSP policy, which "[p]rohibits a pursuit from continuing solely because the subject continues to flee," and argues that Harper's theft offense did not justify the subsequent chase. *Id.* at ¶¶ 12, 14. The Estate filed the original Complaint on October 3, 2018, against the supervisory Defendants (Sanders, Payne, and Kidd), as well as five unknown KSP troopers who participated in the chase. DE #1. After the Court permitted expedited discovery of the trooper identity (*see* DE ##7, 12), Plaintiff amended the Complaint to include them as Defendants, without altering any of the claims against the supervisory Defendants.[3] DE #16. The Estate asserts a violation of Moore's substantive due process right under the Fourteenth

---

Thus, the Court references DE #16, as the now-operative Complaint, in reciting the relevant facts, and this ruling applies to the later pleading.

[3] In addition to adding the troopers, Plaintiff dropped his previous claim for assault and battery. *Compare* DE #1 at ¶ 20 with DE #16. This change did not impact the supervisory Defendants.

2

Amendment via 42 U.S.C. § 1983, as well as state law negligence and gross negligence claims, *id.* at ¶¶ 15–18, seeking compensatory and punitive damages, *id.* at ¶¶ 9, 19.

The supervisory Defendants move to dismiss the claims, maintaining that the § 1983 theory against them fails because it inadequately alleges individual supervisory liability, and arguing that, regardless, qualified immunity (and state official immunity, as applicable) bar recovery. DE #9. The Estate responded (DE #18), and Defendants replied (DE #19).

## II.     Motion to Dismiss Standard

Rule 12 dismissal is appropriate if a complaint "fail[s] to state a claim upon which relief can be granted[.]" Fed. R. Civ. P. 12(b)(6). The complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief[.]" Fed. R. Civ. P. 8(a)(2). In deciding a Rule 12 motion, "the complaint is viewed in the light most favorable to plaintiffs, the allegations in the complaint are accepted as true, and all reasonable inferences are drawn in favor of plaintiffs." *Nwanguma v. Trump*, 903 F.3d 604, 607 (6th Cir. 2018) (citing *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008)). However, the Court is not required to accept as true "a legal conclusion couched as a factual allegation[.]" *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1965 (2007). Rule 12(b)(6) survival "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action[.]" *Id.* Although Rule 8 sets a relatively low bar for pleading adequacy, "it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950 (2009).

Hinging on Rule 8's minimal standards, *Twombly* and *Iqbal* require a plaintiff to "plead facts sufficient to show that her claim has substantive plausibility." *Johnson v. City of Shelby*, 135 S. Ct. 346, 347 (2014). The factual allegations collectively must "raise a right to relief above the

3

speculative level[,]" *id.*, and "state a claim that is plausible on its face, i.e., the court must be able to draw a 'reasonable inference that the defendant is liable for the misconduct alleged.'" *Nwanguma*, 903 F.3d at 607 (quoting *Iqbal*, 129 S. Ct. at 1949 (citation omitted)). This "plausibility standard" does not require a showing that success on the claims is *probable*, "but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 129 S. Ct. at 1949. Where plaintiffs state "simply, concisely, and directly events that . . . entitled them to damages," the rules require "no more to stave off threshold dismissal for want of an adequate statement[.]" *Johnson*, 135 S. Ct. at 347; *see also El-Hallani v. Huntington Nat. Bank*, 623 F. App'x 730, 739 (6th Cir. 2015) ("Although *Twombly* and *Iqbal* have raised the bar for pleading, it is still low.").

Unadorned, naked assertions warrant no presumption of truth and are not well-pleaded facts in the plausibility analysis. *Iqbal*, 129 S. Ct. at 1949. "Plausibility is a context-specific inquiry," *Ctr. for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 369 (6th Cir. 2011), "requiring the reviewing court to draw on its experience and common sense[,]" *Iqbal*, 129 S. Ct. at 1950. In deciding a dismissal motion attacking pleading adequacy, courts must assess "the facial sufficiency of the complaint . . . without resort to matters outside the pleadings[,]" with the limited exception of "exhibits attached to the complaint, public records, items appearing in the record of the case, and exhibits attached to defendant's motion to dismiss, so long as they are referred to in the complaint and are central to the claims contained therein." *Gavitt v. Born*, 835 F.3d 623, 640 (6th Cir. 2016) (citations omitted),

### III. Dismissal of Claims against Defendant Kidd

Based on Defendants' representation that Kidd was not commanding the KSP post responsible for the allegedly improper chase (*see* DE #9 at 3), the Estate agrees to dismiss its

claims against him. DE #18 at 1. Plaintiff requests dismissal of the claims against Kidd without prejudice to renewal, should discovery reveal Kidd's involvement, while Defendants seek dismissal with prejudice. Because the Estate did not respond on the merits as to Kidd, but rather accepted the representation that Kidd had no factual role, the Court does dismiss him without prejudice. This is the functional equivalent of a voluntary dismissal, so here should result in dismissal without prejudice.

## IV. The First Amended Complaint does not clear the *Iqbal/Twombly* hurdle.

The Complaint alleges claims against the KSP hierarchy and against directly involved troopers. Its federal component is a § 1983 count, grounded on substantive due process under the Fourteenth Amendment. In the bystander death context, such a claim essentially requires that the involved officers had an intent to harm the pursued person—a purpose beyond mere apprehension of the suspect. *See Cty. of Sacramento v. Lewis*, 118 S. Ct. 1708, 1711–12 (1998) (holding that "in a high-speed automobile chase aimed at apprehending a suspected offender . . . only a purpose to cause harm unrelated to the legitimate object of arrest will satisfy the element of arbitrary conduct shocking to the conscience, necessary for a due process violation"); *accord Plumhoff v. Rickard*, 134 S. Ct. 2012, 2022 n.4 (2014); *see also Guertin v. State of Mich.*, 912 F.3d 907, 924 (6th Cir. 2019) (quoting *Lewis*, 118 S. Ct. at 1720) (assessing, in the police chase context "whether the state actor applie[d] force 'maliciously and sadistically for the very purpose of causing harm'—in other words, whether he acted with an intent to harm"). The supplemental state claims involve negligence, which has a typical elemental formulation under Kentucky law. *See, e.g., Keaton v. G.C. Williams Funeral Home, Inc.*, 436 S.W.3d 538, 542 (Ky. Ct. App. 2013) (identifying the elements of a Kentucky negligence claim as duty, breach of duty, and proximately resulting damages).

Leaving aside the factually-involved troopers, the claims against the remaining hierarchical defendants—the KSP Commissioner and Deputy—require a particular analysis as to individual liability. As discussed more fully in the immunity section, § 1983 supervisor liability requires culpable conduct by the individual supervisor. It is not enough that a supervisor have a place or position of authority. Rather, he must actively engage in behavior leading to the wrong; inaction does not suffice. *See, e.g., Bellamy v. Bradley*, 729 F.2d 416, 420 (6th Cir. 1984). Similarly, Kentucky does not vicariously impose individual liability on supervisors. *See Yanero v. Davis*, 65 S.W.3d 510, 528 (Ky. 2001). Thus, absent proof a supervisor himself directly and unreasonably employed the incompetent or himself did not, in the ministerial sense, abide by an objective conduct rule, the state supervisor will not face individual tort liability.

The Court has carefully assessed the First Amended Complaint. As to the hierarchical defendants, the pleading cites only their positions. *See* DE #16 at ¶¶ 5–6. Generically, and as applicable to all defendants, the Complaint alleges, in ¶ 9:

> The individual Defendants named above knowingly participated or acquiesced in, contributed to, encouraged, implicitly authorized or approved the conduct described below individually and in their official capacities with the KSP. The offenses described below resulted from the failure of the supervisory officials named above to employ qualified persons for positions of authority, and/or to properly or conscientiously train and supervise the conduct of such persons after their employment, and/or to promulgate and enforce appropriate operating policies and procedures either formally or by custom to protect the constitutional rights of Mr. Moore.

Further, in the lone other allegations as to generic conduct, again blanketing all defendants, the Complaint avers:

> Plaintiff believes and, after reasonable discovery, will show that this pursuit and the tragedy that followed were the result of training and supervision (or a lack thereof), and/or policies, customs and practices (or a lack thereof), which are contrary to or expressly violated written policies of the KSP, law enforcement standards generally, and plain common sense, and were the "moving force" behind Mr. Moore's death.

*Id.* at ¶ 16. Interestingly, most of the Complaint asserts the facts of the chase sequence and the content of the KSP pursuit policy, a policy Plaintiff does not criticize. Instead, Plaintiff repeatedly asserts that the troopers implicated did not adhere to the applicable policy. *See id.* at ¶¶ 2, 14 ("The pursuit made the subject of this action violated the letter and spirit of the KSP Pursuit Policy.").

The Complaint lacks factual allegations, as to the hierarchical defendants, plausibly indicating a valid claim. Although the pleading contains some language tracking theories for supervisor liability, the language is elemental and conclusory, not adorned with further, specific factual content. Indeed, Plaintiff alleges nothing particular to the Commissioner and Deputy Commissioner other than their positional roles and theoretical places in the training and oversight of subordinate troopers. Plaintiff obviously hopes the Court would allow such a generic complaint to open discovery's door: ¶ 16 reflects the belief that "after reasonable discovery" Plaintiff could show deficiencies in training and supervision. *See also* DE #18 at 7 (Plaintiff seeking to "pursue discovery to see whether Defendants expressly acquiesced in or approved of the misconduct of the KSP troopers involved in the chase"). This is a cart, horse sequence. The pleading must be adequate for discovery to proceed. *See Iqbal*, 129 S. Ct. at 1950. Here, if the Court accepted these allegations as sufficient—with utterly no direct and particular empirical assertion as to conduct of the supervisory personnel—then any plaintiff in any police case could individually sue every supervisor up the chain, surmising or believing that discovery may supply supportive facts on deficient training or oversight. That is not the *Iqbal*/*Twombly* rubric. Speculation about possible claims does not cross the threshold, and, though recognizing the gravity of this subject matter, the Court cannot allow the generic and conclusory Complaint to go forward against Sanders and Payne. The facts alleged, such as they are, do not show substantive plausibility.

**V.     Sanders and Payne are entitled to qualified immunity on the § 1983 claim.**

Defendants assert qualified immunity from § 1983 liability, arguing that they did not violate any clearly established constitutional right of Moore. The qualified immunity doctrine shields public officials—such as police officers—"from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 129 S. Ct. 808, 815 (2009) (quoting *Harlow v. Fitzgerald*, 102 S. Ct. 2727, 2738 (1982)). This doctrine "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.* "Qualified immunity provides police officers 'breathing room to make reasonable but mistaken judgments and protects all but the plainly incompetent or those who knowingly violate the law.'" *Mullins v. Cyranek*, 805 F.3d 760, 765 (6th Cir. 2015) (quoting *Stanton v. Sims*, 134 S. Ct. 3, 5 (2013) (per curiam) (citations and quotation marks omitted)). Importantly, qualified immunity is "an immunity from suit rather than a mere defense to liability[,]" and reviewing courts should resolve the issue as early in a case as practicable. *Mitchell v. Forysth*, 105 S. Ct. 2806, 2815 (1985).

The qualified immunity inquiry is twofold, requiring assessment of "(1) whether the facts alleged by the plaintiff make out the violation of a constitutional right and (2) whether the right at issue was 'clearly established' at the time of the alleged violation." *Gavitt*, 835 F.3d at 640. The Court may address either prong first, and, ultimately, "if the plaintiff cannot make both showings, the officer is entitled to qualified immunity." *Id.* (quoting *Brown v. Lewis*, 779 F.3d 401, 412 (6th Cir. 2015)). At this stage, a plaintiff can overcome a claim of qualified immunity "by alleging facts making out a plausible claim that defendants' conduct violated a constitutional right that was

clearly established at the time of the violation." *Id.* (citing *Johnson v. Moseley*, 790 F.3d 649, 653 (6th Cir. 2015)). Because the Estate has not plausibly alleged that Sanders or Payne violated Moore's constitutional rights, they are entitled to qualified immunity. Notably, Plaintiff devotes but a solitary paragraph to the topic. *See* DE #16 at ¶ 9.

The theory of the Estate's § 1983 "supervisory liability"[4] claim against Sanders and Payne is: (1) the KSP had an express policy in place that forbade this sort of chase; (2) several KSP troopers still conducted the violative pursuit over an extended distance and period of time; and, thus, (3) these supervisory Defendants must have improperly trained their troopers to disregard the policy and engage in such chases nonetheless, which resulted in violation of Moore's constitutional rights. *See, e.g.*, DE #18 at 3–4. However, a supervisor will not be liable under § 1983 for a failure to train or supervise subordinates absent some showing that he "encouraged the specific incident of misconduct or in some other way directly participated in it. At a minimum, a § 1983 plaintiff must show that a supervisory official at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate." *Bellamy*, 729 F.2d at 420 (citing *Hays v. Jefferson County*, 668 F.2d 869, 872–74 (6th Cir. 1982)). A "mere failure to act" will not support a supervisory liability claim. *Peatross*, 818 F.3d at 241. Rather, "[t]here must be some conduct on the supervisor's part to which the plaintiff can point that is directly correlated

---

[4] Of course, "the Supreme Court of the United States concluded that in § 1983 suits, 'the term supervisory liability is a misnomer.'" *Peatross v. City of Memphis*, 818 F.3d 233, 241 n.3 (6th Cir. 2016) (quoting *Iqbal*, 129 S. Ct. at 1957). "In other words, a supervisor cannot be held liable simply because he or she was charged with overseeing a subordinate who violated the constitutional rights of another." *Id.* at 241. Plaintiff denies any reliance on a *respondeat superior* theory or argument that Sanders and Payne are liable solely because they oversaw the troopers who engaged in alleged misconduct. *See* DE #18 at 2 n.1. However, the Amended Complaint offers no concrete facts as to Sanders or Payne, beyond their supposed oversight of the troopers; thus, as discussed, the attempted connection between the troopers' alleged misconduct and the supervisors' roles is too attenuated to overcome qualified immunity.

with the plaintiff's injury." *Id.* (quoting *Essex v. Cty. of Livingston*, 518 F. App'x 351, 355 (6th Cir. 2013). At the very least, the plaintiff must make a plausible showing "that the supervisors had 'participated, encouraged, authorized or acquiesced in' the offending conduct[.]" *Doe v. City of Roseville*, 296 F.3d 431, 440 (6th Cir. 2002) (quoting *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999)). In sum, "a supervisory official's failure to supervise, control or train the offending individual is not actionable unless the supervisor either encouraged the specific incident of misconduct or in some other way directly participated in it." *Shehee*, 195 F.3d at 300.[5]

Against this backdrop, two relatively recent Sixth Circuit decisions outline what sort of allegations *are* sufficient to state supervisory § 1983 claims. In *Coley v. Lucas County*, 799 F.3d 530 (2015), the court denied a sheriff qualified immunity and declined to dismiss the case against him after subordinate officers put a shackled pretrial detainee in a chokehold, resulting in his death. The court collectively relied on the complaint's averments that: (1) the sheriff had generally failed to train and supervise his employees regarding the use of chokeholds and injuries that might result; (2) the sheriff had failed to properly investigate excessive force allegations; (3) the sheriff had "full knowledge" of the specific assault at issue; and (4) the sheriff "intentionally and deliberately made false statements to federal officials about [his] knowledge of" that assault and the subordinates' subsequent failure to provide medical attention, in an effort to cover up the subordinates' behavior. *Coley*, 799 F.3d at 542. The following year, in *Peatross*, the court examined another § 1983 excessive force issue—and relied on a similar collection of assertions in denying the police director qualified immunity for his role in his subordinates' shooting death of an arrestee. The court relied on a showing that: (1) the director generally failed to supervise and

---

[5] Relatedly, a § 1983 failure-to-train inquiry also considers whether "there is a causal connection between the defendant's wrongful conduct and the violation alleged." *Peatross*, 818 F.3d at 242 (citing *City of Roseville*, 296 F.3d at 441).

10

train the officers to avoid the use of excessive force or use such force properly; (2) the director failed to investigate the incident properly; (3) the director "attempted to cover-up the unconstitutional conduct of his subordinates by exonerating the officers in an effort to escape liability"; and—perhaps most critically—(4) after a public admonishment from the mayor, as a result of the staggering number of police shootings in recent years, the director had "acknowledged a dire need to review and improve the police department's operations" and the officer disciplinary process, yet had taken absolutely no action since that time. *Peatross*, 818 F.3d at 243. Given these considerations, the court found that the director "'at a minimum, knowingly acquiesced' in the unconstitutional conduct of his subordinates through the execution of his job functions." *Id.* at 244 (quoting *Coley*, 799 F.3d at 542).

The Estate's allegations in this case fall far short of those deemed sufficient in *Coley* and *Armstrong*. Notably, the Estate does not allege that Payne or Sanders knew of this incident or any other incidents in violation of the KSP's pursuit policy, that they failed to properly investigate this incident or other similar incidents, that they tried to conceal the troopers' misconduct, exonerate them to avoid liability, or hinder the investigation in any way, or that—as in *Peatross*—Sanders or Payne had previously recognized a need for reform in training or supervision regarding the pursuit policy and failed to implement change. Plaintiff merely argues that, because there was an applicable KSP policy and the troopers violated it here, the Court should infer that the supervisors must have implicitly condoned, or knowingly acquiesced in, such behavior. *See, e.g.*, DE #18 at 4 ("We know what the KSP pursuit policy says. That so many KSP troopers would ignore the policy . . . clearly raises the question of how such Troopers are trained and supervised[.]"). This suggestion alone (absent any supporting facts) is simply insufficient to "mak[e] out a plausible claim that defendants' [individual] conduct violated a constitutional right[.]" *Gavitt*, 835 F.3d at

640. Critically, the Estate fails to provide any facts related to conduct or action—the required "active unconstitutional behavior[,]" *see Peatross*, 818 F.3d at 241—on the parts of Sanders or Payne.[6]

The Estate seeks discovery to form a basis for its speculation that the supervisory Defendants' actions constitute knowing acquiescence in the troopers' allegedly unconstitutional conduct.[7] *See* DE #16 at ¶ 16 ("Plaintiff believes and, after reasonable discovery, will show that this pursuit and the tragedy that followed were the result of training and supervision (or a lack thereof)[.]"). However, where a plaintiff fails to allege facts that show a constitutional violation is plausible (rather than merely *possible*) on the face of the complaint—especially in the qualified immunity context—he is not afforded discovery to mine for proof. *See Iqbal*, 129 S. Ct. at 1954 (concluding that where the "complaint is deficient under Rule 8, [the plaintiff] is not entitled to discovery"). Here, the facts as alleged in the Amended Complaint do not collectively "raise a right to relief above the speculative level[,]" such that the Court can "draw a reasonable inference that the defendant is liable for the misconduct alleged[.]" *Nwanguma*, 903 F.3d at 607 (internal quotation marks and citation omitted). The lack of an adequately-pleaded constitutional violation

---

[6] Needless to say, considering that the Amended Complaint does not allege any specific facts relevant to Sanders or Payne, it also fails to draw a causal connection between their actions and the alleged misconduct of the troopers.

[7] Significantly, the Estate fails even to allege that Sanders or Payne knew of this incident at any point prior to suit. Of course, they may have, but the bald, conclusory allegation that Defendants "knowingly participated or acquiesced in" unconstitutional conduct, without any foundational facts, is plainly insufficient to demonstrate plausibility. DE #16 at ¶ 9. This does not mean the training and management of the troopers is off-limits in discovery; what the troopers knew about chase protocol, and oversight of that important training and performance topic, likely is within Rule 26(b)(1)'s scope.

on the part of Sanders or Payne at this stage compels a finding that they enjoy qualified immunity on the § 1983 claim.[8]

## VI. The Estate's state law negligence claims fail.

The Amended Complaint is likewise deficient, relative to the hierarchical defendants, on the state law claims. First, Plaintiff disavows any vicarious liability theory. *See* DE #18 at 2 n.1. Thus, the circumscribed individual liability model of *Yanero v. Davis* applies.[9] Individual liability hinges on the "misfeasance or negligence" of Sanders and Payne themselves, not the acts of subordinates under them. *Yanero*, 65 S.W.3d at 528. Thus, under Kentucky law, hierarchical defendants, as public officials, cannot be individually liable for the negligence of their subordinates "unless they ratify or participate in the tortious act." *Franklin Cty., Ky. v. Malone*, 957 S.W.2d 195, 199 (Ky. 1997), *overruled on other grounds by Com. v. Harris*, 59 S.W.3d 896 (Ky. 2001) and *Yanero*, 65 S.W.3d 510. Responsibility requires "proof of personal wrongdoing," *id.* at 200, by the supervisors.

Like the Amended Complaint's allegations regarding the federal claims, the operative pleading in this context relies on a fault syllogism, not factual assertions. There was a policy; troopers violated it; thus, high-level supervisors—those with "ultimate responsibility" at KSP— must have inadequately trained or supervised the troopers. This construct speculatively presumes that a claim founded on any trooper misconduct or policy violation indicates a valid claim up the

---

[8] "[T]he Supreme Court has 'repeatedly . . . stressed the importance of resolving immunity questions at the earliest possible stage in litigation.'" *Peatross*, 818 F.3d at 240 (quoting *Pearson*, 129 S. Ct. at 815). Indeed, "the 'driving force' behind creation of the qualified immunity doctrine was a desire to ensure 'that insubstantial claims against government officials [will] be resolved prior to discovery.'" *Pearson*, 129 S. Ct. at 815 (quoting *Anderson v. Creighton*, 107 S. Ct. 3034, 3040 n.2 (1987) (internal quotation marks and citation omitted)).

[9] *See Yanero*, 65 S.W.3d at 528 ("Public officers are responsible only for their own misfeasance and negligence and are not responsible for the negligence of those employed by them if they have employed persons of suitable skill.").

chain for faulty oversight and training. Complaints require sufficiently supportive facts. Negligence by an officer does not, perforce, signal systemic negligence by the powers that be.

Further, the Court finds Sanders and Payne entitled to qualified official immunity, on this record. The two highest officials within the KSP surely occupy discretionary roles with respect to the broad contours of policy formulation and implementation. The *Yanero* dichotomy focuses on the functions of the official, in context. *See Yanero*, 65 S.W.3d at 521. The query is for the dominant (viz. discretionary or ministerial) characteristic of the discrete function. *See id.* at 521–22. The pursuit policy at issue here (*see* DE #16 at ¶ 14) does not in any manner directly regulate behavior by the KSP Commissioner and Deputy Commissioner. Thus, unlike the rules in, say, *Yanero* or *Finn v. Warren County*,[10] the hierarchical officers here were not under or subject to the policy itself. That is, Sanders and Payne were not, as chieftains within the KSP, taking orders or following a stricture by virtue of the policy. There was no "objective and binary directive" applicable to them. *Haney v. Monsky*, 311 S.W.3d 235, 242 (Ky. 2010), *as corrected* (May 7, 2010). Sanders and Payne are not troopers, were not involved in the pursuit, and had no direct factual role in the events in question. The policy at issue does not purport to regulate conduct by hierarchical defendants—at least not ones at the level of Sanders and Payne. *See Wales v. Pullen*, 390 S.W.3d 160, 167 (Ky. Ct. App. 2012) (finding high-level public works director not subject to quotidian and routine policy regarding tree removal: As to director, "none of these duties involve obedience to the orders of others or the execution of any specific act, such that they are ministerial in nature. Thus, Pullen's [the supervisor's] duties were discretionary in nature under *Yanero*.").

---

[10] *Finn v. Warren Cty., Kentucky*, 768 F.3d 441, 449 (6th Cir. 2014) (finding official immunity overcome where "the plaintiffs pointed to the jail's training policy, which specifically provided that '[t]he Jailer ... shall establish and monitor each employee's training and fitness to help ensure satisfactory performance'"). The KSP policy, by contrast, includes no directive to the top-level officers.

The Court further notes that, even as to street officers involved in a pursuit, Kentucky courts have frequently treated application of a chase-policy as a discretionary function. *See, e.g.*, *City of Brooksville v. Warner*, 533 S.W.3d 688, 694 (Ky. Ct. App. 2017), *review denied* (Dec. 7, 2017) (distinguishing discretionary chase-policy application from the ministerial act of driving during the chase and concluding that the "officer ha[d] discretion to decide whether to begin, continue, or end the emergency pursuit, but not for the way he or she operate[d] the police vehicle during the emergency pursuit"). Individual driving decisions by an officer, intra-pursuit, may be ministerial, but the decision whether to begin, continue, and end pursuit is, per several cases, discretionary. *See Almon v. Kilgore*, No. 3:19-CV-0004-GFVT, 2019 WL 1179387, at *4 (E.D. Ky. Mar. 13, 2019) ("While an officer does not have discretion on the manner in which he operates his vehicle during an emergency pursuit, the decisions concerning whether to begin, continue, and/or end an emergency pursuit are discretionary acts."); *accord Cox v. Cross*, No. 2016-CA-001945-MR, 2019 WL 2554214, at *3 (Ky. Ct. App. June 21, 2019); *Pugh v. Meinhart*, No. 2017-CA-000043-MR, 2018 WL 7890681, at *3 (Ky. Ct. App. Mar. 29, 2018) ("We believe that Pugh, in reliance on the S.O.P., was required to exercise discretion on whether to pursue Donta, continue the pursuit, or terminate the pursuit."). If that is so, the policymakers themselves surely are serving a discretionary role with respect to the same policy. The significantly removed hierarchical defendants obviously would be several steps from the troopers themselves with respect to the demarcation set forth in these authorities.

For these reasons, the Court finds the state claims, as to Sanders and Payne, properly subject to dismissal under Rule 12(b)(6).[11]

---

[11] Plaintiff cursorily asserts that, should the Court find "deficiency in Plaintiffs' Original or the tendered First Amended Complaint that renders it vulnerable to dismissal," it must permit amendment, unless such amendment would be futile or inequitable. DE #18 at 8–9. Plaintiff cites

## VII. Conclusion

The Court **GRANTS** DE #9 and **DISMISSES** all claims against the supervisory Defendants. The dismissal is **with prejudice** as to Sanders and Payne.

This the 17th day of July, 2019.

Signed By:
*Robert E. Wier* REW
**United States District Judge**

---

no Sixth Circuit law supporting this proposition; indeed, the relevant Sixth Circuit cases permitting leave to amend upon dismissal in civil rights cases involve *pro se* plaintiffs, as well as independent indication that amendment would cure the complaint's perceived deficiency. *See, e.g.*, *Brown v. Matauszak*, 415 F. App'x 608, 614 (6th Cir. 2011) (directing the district court to permit amendment where "[t]he sixty-one-page memorandum of law accompanying that motion demonstrates that [the *pro se* plaintiff] had the facts necessary to state a non-frivolous basis for several of his claims[,]" but merely failed to properly plead them in the first instance); *Tolliver v. Noble*, 752 F. App'x 254, 263 (6th Cir. 2018) (finding abuse of discretion in denial of amendment under the case's "unique circumstances[,]" involving a *pro se* prisoner who explained the reason for and purpose of the sought amendment and diligently endeavored to timely submit a proposed amended complaint to the court); *Gordon v. England*, 354 F. App'x 975, 981–82 (6th Cir. 2009) (remanding to permit amendment where the *pro se* plaintiff "was likely to have been unaware of the requirements of Rule 15"); *cf. Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 438 (6th Cir. 2008) (noting that "a rule [requiring leave to amend upon dismissal] is not only wholly without support, [but] it would render a motion to dismiss useless in disposing of unfit claims" and observing that "Plaintiffs never requested leave for additional amendments, and it is not the district court's role to initiate amendments"). Plaintiff—represented by counsel—does not formally or actually request leave to amend per the Rule 15 strictures. The half-hearted "request" trailing DE #18 is more of an assertion of right, and no actual amendment motion pends, depriving Defendants of opportunity to formally respond on the issue. Nor does Sweat tender a proposed amended complaint, or detail what he would seek to add via amendment, to permit the Court to evaluate futility. Indeed, the record strongly suggests that the supervisory Defendants factually had no hands-on role in the chase, dooming the claims against them per the applicable substantive due process and other standards, regardless of pleading sufficiency. Under the circumstances, the Court wholly lacks the necessary information to perform the required Rule 15 analysis and thus declines Plaintiff's skeletal, generic invitation to initiate amendment. Sweat does not validate the request with authority or a proposed amendment. *See* LR 7.1 ("[A] motion must state with particularity the grounds for the motion, the relief sought, and the legal argument necessary to support it.").